UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMELIA WASHINGTON, | ) | CASE NO. 3:15CV489 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | MEMORANDUM OPINION & ORDER |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Jamelia Washington ("Plaintiff") seeks judicial review of the final decision of Carolyn W.
Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"),
denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following
reasons, the Court REVERSES the ALJ's decision and REMANDS the instant case for the ALJ to
reconsider, reevaluate, and further analyze and explain whether Plaintiff's mental residual functional
capacity determination should include limitations on production and Plaintiff's ability to withstand
the stress and pressures of day-to-day work activity.

## I.    PROCEDURAL AND FACTUAL HISTORY

Plaintiff filed her application for SSI on July 19, 2011 alleging disability beginning August
2, 2006[2] due to bipolar disorder, sleeping problems, back pain, left arm pain, and post-traumatic

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security,
replacing Michael J. Astrue.

[2]Plaintiff notes in her brief on the merits that she received social security benefits as a child and these
benefits were terminated in September 1997. ECF Dkt. #15 at 2, fn.1, citing Tr. at 213. Plaintiff indicates
that her benefits were terminated in September 1997 but were either reinstated in a hearing level decision in
December 1999 or granted in a new application as she received benefits again until she was incarcerated in
2002 or 2003 when they were again terminated.  *Id*., citing Tr. at 213, 344. Plaintiff notes that the ALJ did
not mention her past receipt of social security benefits in her decision. ECF Dkt. #15 at 2, fn. 1.
     The ALJ did indicate that Plaintiff had previously filed a SSI application on March 30, 2007 that was
denied at the initial level and reconsideration levels administratively which Plaintiff never appealed. Tr. at
15. The ALJ found that reopening of this claim was not warranted because more than two years had elapsed

stress disorder ("PTSD"). ECF Dkt. #11 ("Tr." ) at 106-109, 288. The SSA denied Plaintiff's applications initially and on reconsideration. *Id*. at 110-112, 124. Plaintiff requested an administrative hearing, and on March 6, 2013, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id*. at 34, 125-132. On August 20, 2013, the ALJ issued a decision denying SSI. *Id*. at 15-28. Plaintiff appealed, and on January 16, 2015, the Appeals Council denied review. *Id.* at 1-3.

On March 13, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On July 13, 2015, Plaintiff, through counsel, filed a brief on the merits. ECF Dkt. #15. On September 11, 2015, Defendant filed a brief on the merits. ECF Dkt. #17. On September 25, 2015, Plaintiff filed a reply brief. ECF Dkt. #18.

## II.     SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

On August 20, 2013, the ALJ issued a decision finding that Plaintiff suffered from major depressive disorder, bipolar disorder, anxiety disorder, schizoaffective disorder, PTSD, and a learning disability, not otherwise specified ("NOS"), which qualified as severe impairments under 20 C.F.R. § 416.920(c). Tr. at 17. The ALJ further determined that Plaintiff's impairments, individually and in combination, did not meet or equal any of the Listings. *Id*. at 18-19.

The ALJ proceeded to find that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the nonexertional limitations of: work requiring no more than a Specific Vocational Preparation ("SVP") of 2 with occasional interaction with the public, co-workers and supervisors. Tr. at 19-20. Based upon this RFC and the testimony of the VE, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy, including the representative occupations of a housekeeping cleaner/motel cleaner, and stock clerk/marking clerk. Tr. at 27-28. Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and she was not entitled to SSI. *Id.* at 28.

---

since the initial redetermination was rendered by the time that Plaintiff filed the current application. *Id.* The ALJ considered Social Security Ruling 95-5p and found it inapplicable. *Id*. She therefore found the November 15, 2007 administrative reconsideration denial to be final and binding and she applied res judicata up to the date of the new application. *Id*.

### III.  STEPS FOR ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

-3-

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.      RELEVANT MEDICAL HISTORY AND TESTIMONY

### A.      MEDICAL HISTORY

The Court discusses only the medical evidence relating to Plaintiff's mental health impairments as Plaintiff does not challenge the ALJ's evaluation of her physical impairments and her decision relating to her physical impairments.

On October 23, 2006, Dr. White, Ph.D., conducted a psychological interview for the agency. Tr. at 299-305.  Plaintiff informed Dr. White that she had bipolar disorder, symptoms of depression, and a sleep disturbance with recurrent nightmares.  *Id.* at 299.  She reported that she was currently taking Seroquel and Benedryl.  *Id.*  Plaintiff reported symptoms of depression and anxiety, and she reported a history of suicidal ideation with no attempts but a one-week hospitalization in 1997 for major depression.  *Id.* at 300.  She explained that she was participating in counseling at the Zepf Center and had previously been prescribed Trazadone, Remeron, Prozac and Thorazine.  *Id.*  She indicated that she had spent 31 months in prison for burglary and had been released on August 21, 2006 and was living with her mother.  *Id.*

-4-

Plaintiff stated that she had two daughters and one son who are being raised by "family." Tr. at 300.  She explained that she quit school in tenth grade, was enrolled in special education classes,  quit because she did not like people.  *Id*. at 301.  She reported conflicts with teachers and classmates, health issues, behavioral issues, emotional issues, irregular attendance, and frequent tardiness*.  Id*.  Plaintiff indicated that her longest employment was for three weeks "making a sandwich" and she left the job because she could not keep up.  *Id*.  She reported that she goes to bed at 6:00 a.m. and spends the day sleeping, she had trouble falling asleep at night and has a lack of energy, poor appetite, infrequently socialization with family, no socialization with family and no interest in hobbies.  *Id*.  Plaintiff indicated that her mother helps feed, bathe and dress her and her mother takes care of the household chores.  *Id*.

Dr. White observed that Plaintiff had poor eye contact, tense posture, average social skills and she had no evidence of over-reporting or under-reporting.  Tr. at 302.  He found Plaintiff's quality of conversation to be pressured, digressive and overly elaborate and he noted that she became easily confused during questioning, although she was able to maintain attention.  *Id*.  He noted that she displayed a blunted and flattened affect, no hallucinations, no paranoid ideation, no symptoms of PTSD.  *Id*.  Psychological testing showed that Plaintiff had a full-scale IQ of 71, indicative of a borderline range of intelligence.  *Id*. at 303.  Other testing showed that she had the grade equivalents of 2.3 in word reading, 3.0 in sentence comprehension, 1.5 in spelling, and 1.6 in math computation.  *Id*. at 304.

Dr. White diagnosed Plaintiff with bipolar disorder, NOS, personality disorder, NOS with antisocial features, and borderline intellectual functioning ("BIF").  Tr. at 304.  He rated her global assessment of functioning ("GAF") at 45, indicating severe symptoms.  *Id*.  He opined that she was unimpaired in understanding, remembering and following instructions, mildly to moderately impaired in maintaining attention, concentration, persistence and pace to perform simple repetitive tasks, mildly to moderately impaired in relating to others, and significantly impaired in withstanding the stress and pressures of daily work activities.  *Id*. at 305.  He also recommended that a payee to be assigned to manage funds should Plaintiff be found disabled.  *Id*.

On November 14, 2006, Zepf Community Mental Health Center Psychiatrist Dr. Haley performed a psychiatric history and evaluation of Plaintiff. Tr. at 308. Plaintiff was referred from Rescue Crisis and she explained that she had been out of medication for several months because she did not get an appointment from Zepf, although the record showed that Plaintiff missed the intake appointment scheduled for her. *Id*.

Plaintiff reported depression since childhood and mood changes and she indicated that she had bad dreams all of her life of a man or a woman with knives who are going to do bad things to her. Tr. at 308. She indicated that in some of the dreams, a man has been hunting her for years and people are cutting her. *Id*. She also reported that she hears voices, including the voice of a man she used to know who is now dead and who was stabbed in her presence, and the voice tells her to kill herself or to do bad things to others. *Id*. She stated that she attempted an overdose at age 17. *Id*. She received medication in Marysville Prison over the past few years. *Id*. She reported cannabis use since the age of 14 on a daily basis and indicated that she had not used since June of 2004. *Id*. She also reported alcohol abuse off and on, but she reported on intake that she used alcohol daily since the age of 14. *Id*. Dr. Haley noted that most of Plaintiff's probation violations in the past were related to substance abuse. *Id*. Plaintiff indicated that she had three minor children who were living with other family members. *Id*. at 309.

Upon examination, Dr. Haley found that Plaintiff made eye contact, had a depressed mood, flat affect, slow speech and was clearly intellectually limited. Tr. at 309. She indicated that Plaintiff had adequately organized thoughts, limited insight, and significant attention and concentration deficits. *Id.* She noted that Plaintiff showed no evidence of poorly modulated anger, although her history indicated as much. *Id.* She diagnosed schizoaffective disorder, depressed type, history of cannabis dependence and alcohol abuse, in remission, learning disorder not otherwise specified, and low intellect. *Id*. at 310. She rated her global assessment of functioning at 35, indicative of severe symptoms. *Id.* She prescribed Seroquel, noted that an antidepressant or second mood stabilizer may be necessary, and recommended continued 12-step meetings, working with her support provider to obtain SSI, Medicaid and other resources, and possible referral to the Bureau of Vocational Resources and weight management. *Id.*

On November 29, 2006, Plaintiff followed up with Dr. Haley and reported that she was depressed and anxious and was having trouble sleeping as she was having bad dreams every night. Tr. at 313. She made good eye contact and her judgment and insight were adequate. *Id*. Plaintiff expressed frustration that she was not greatly improved and she indicated that Remeron had worked for her in the past. *Id*. Dr. Haley diagnosed schizoaffective disorder, depressed type, and increased the Seroquel and added Remeron. *Id*.

On December 12, 2006, Plaintiff followed up with Zepf Center for a medication check and reported that the medications helped with depression and sleep, but not with her hearing of voices. Tr. at 311. She stated that she could not sit still and was isolating herself at home. *Id*.

On December 27, 2006, January 31, 2007, February 19, 2007, March 20, 2007, May 15, 2007, May 18, 2007, Plaintiff did not show for scheduled appointments at Zepf Center. Tr. at 317-323.

On July 21, 2007, Dr. Deardorff, Ph.D., clinical psychologist, performed an assessment of Plaintiff's mental status for the agency. Tr. at 327. Dr. Deardorff noted Plaintiff's complaints of anxiety and depression, nightmares, auditory and visual hallucinations, sense of impending doom, problems with crowds, and her special education background. *Id*. He noted Plaintiff's statements that she did not like her parents as they fought a lot, she was physically abused "by associates," and she witnessed abuse as a child. *Id*. She explained that she has a tenth grade education and was in special education classes with poor grades. *Id*. at 328. She was ridiculed in school and called "retarded" and was expelled from school for fighting. *Id*. She reported her burglary arrest and three-year incarceration. *Id*. at 328. She indicated that she had "a lot" of jobs and her longest employment was in a café for one year when she left because people yelled at her. *Id*.

Dr. Deardorff found that Plaintiff was anxious and depressed, did not exaggerate or minimize her symptoms, and was adequately motivated. Tr. at 328. He found her flow of conversation and thought to be adequate and he noted that her vocabulary and sentence structure suggested that she was of borderline intelligence. *Id*. at 329. Plaintiff maintained adequate eye contact, spoke at an adequate rate of speed, and was preoccupied with her difficulties. *Id*. Dr. Deardorff found that Plaintiff's short-term memory and attention and concentration skills were poor, her judgment was

sufficient to make decisions, except that she may have difficulty managing funds due to her arithmetic skills. *Id*. at 330. He diagnosed Plaintiff with severe major depressive disorder with psychotic features and anxiety disorder not otherwise specified. *Id.* at 331. He rated her GAF as 41, indicative of serious symptoms. *Id.* He opined that her mental ability to relate to others was moderately to seriously impaired, her mental abilities to understand, remember and execute simple instructions and to maintain concentration, persistence and pace were moderately impaired, and her mental ability to withstand daily work stress and pressures was severely impaired. *Id.* at 331-332.

On February 12, 2010, Plaintiff presented to Zepf Mental Health Center requesting psychiatric treatment. Tr. at 409. She explained that it had been two years since she was last at Zepf and she stopped coming to her appointments because her mother could not bring her because of her work schedule. *Id*. at 417. She indicated that she had been taking her girlfriend's Lexapro and Seroquel since she did not have any medications. *Id*. A diagnostic assessment was performed and she was diagnosed with schizoaffective disorder, learning disorder not otherwise specified, cannabis and alcohol abuse in remission, and she was rated a GAF of 48, indicative of serious symptoms. *Id*. at 418.

On March 19, 2010, Plaintiff presented to Zepf for a psychiatric evaluation by Dr. Funke, M.D. Tr. at 421-422. Plaintiff explained that she wanted to get back on her medications of Seroquel, Lexapro and Remeron as they seemed to work for her until she stopped coming to Zepf. *Id*. at 421. She reported that she was taking her friend's Seroquel, but was having mood swings, feeling paranoid, and hearing voices. *Id.*

Upon examination, Dr. Funke found that Plaintiff was cooperative, with a full affect and somewhat dysphoric mood. Tr. at 422. She noted that Plaintiff had fluent and spontaneous speech and Plaintiff reported feeling more depressed, not sleeping well and isolating herself. *Id.* Plaintiff admitted to hallucinations and delusions and she stated that she felt the presence of a man in her room with whom she can communicate. *Id*. She said that she felt suspicious and paranoid of others. *Id*. Dr. Funke diagnosed schizoaffective disorder and rated Plaintiff's GAF at 50, indicative of serious symptoms. *Id.* She prescribed one month dosages of Seroquel and Remeron and told Plaintiff to follow up in two weeks. *Id.*

On June 11, 2010, Plaintiff did not show up for her appointment at Zepf. Tr. at 423. On July 8, 2010, Plaintiff showed for an appointment and indicated that she was irritable and moody. Id. at 424. She denied wanting to hurt others, but said that Stacy wanted to do so. *Id*. Plaintiff's affect was inappropriate, her speech was rapid and then slow and pressured, she was hearing voices and had anxiety. *Id*. Plaintiff's medications were restarted. *Id*.

On September 2, 2010, Plaintiff did not show for her follow up appointment. Tr. at 425.

On March 18, 2011, Plaintiff presented to Unison Behavioral HealthCare for an initial psychiatric evaluation. Tr. at 334. Plaintiff indicated to Dr. Ahmed at the evaluation that she needed to get back on her medications. *Id*. She explained that she had been on Seroquel, Lexapro and Remeron through Zepf Center and had been doing fairly okay, but she had not been on the medications for over two months and she was feeling very angry and irritable with mood swings. *Id.* She indicated that she felt depressed and suffering from PTSD due to past sexual abuse by an uncle and physical abuse by her parents. *Id*. She related symptoms of anhedonia, irritability, mood swings, nightmares, flashbacks, a startle response and anxiety issues. *Id*. She also indicated that she was hearing a voice again from a woman named Stacy, whom she hears and sees, and the only voice that she has been hearing for years. *Id.* She also described nightmares of seeing her uncle abuse her and of seeing people who are out to kill her. *Id.* Plaintiff reported that she had been to jail 10 or 15 times from the age of 19 through 24, and she currently had a girlfriend, but had three children, two which had been adopted by other family members and her nine year-old lived with her and her mother. *Id*. at 335. She was attempting to get her GED. *Id*.

Upon examination, Dr. Ahmed noted that Plaintiff was irritable and upset, she had fair eye contact, she became tearful, she had pressured, loud, hyper speech and logical thought content. Tr. at 336. He noted that her short-term memory was intact, her intellect was average and her insight and judgment were fair. *Id*. He diagnosed Plaintiff with bipolar disorder with psychotic features, chronic PTSD, rule out schizoaffective disorder depressed type, and he rated her GAF as 45, indicative of serious symptoms. *Id.* He prescribed Seroquel, Remeron and Lexapro. *Id*. at 337.

On April 22, 2011, Plaintiff presented to Dr. Ahmed for follow up on her medications. Tr. at 354. She reported that the medications were working as she felt more calm, relaxed and stable.

*Id.* She indicated that she was almost kicked out of group therapy after some trouble when she was stressed out, but they were going to put her back into the group. *Id.* She reported no side effects and was eating and sleeping well. *Id.* Dr. Ahmed noted that Plaintiff had fair eye contact, had normal speech and had a dysphoric mood with congruent affect. *Id.* He found her insight and judgment to be fair and diagnosed bipolar disorder not otherwise specified. *Id.* He continued the Seroquel, Lexapro and Remeron. *Id.* at 355.

On July 8, 2011, Plaintiff followed up with Dr. Ahmed looking nervous and anxious. Tr. at 351. She reported that her anxiety was a little out of control and was feeling somewhat depressed, but she was excited as she had lost 25 pounds and was making lifestyle changes by eating better and exercising. *Id.* She was off of the Lexapro but was taking her other medications regularly and reported no side effects. *Id.* Dr. Ahmed noted fair eye contact, normal volume and tone to her speech, no agitation, a dysphoric mood with congruent affect, and fair insight and judgment. *Id.* He diagnosed bipolar disorder not otherwise specified and increased the Remeron dosage, added Vistaril and Viibryd, kept her on Seroquel, but discontinued Lexapro. *Id.* at 351-352.

On September 27, 2011, Plaintiff presented to Dr. Ahmed with her case manager. Tr. at 404. She reported that she had been off of her medications for three weeks because she missed an appointment and had been having sleep problems, but had gotten some Ambien from a friend to help. *Id.* She indicated that the Seroquel was helping but she was having mood swings since being off of it. *Id.* Dr. Ahmed noted fair eye contact, normal volume and tone to Plaintiff's speech, no agitation, a dysphoric mood with congruent affect, and fair insight and judgment. *Id.* He diagnosed bipolar disorder not otherwise specified and continued the Remeron, Vistaril, Seroquel and Celexa, and added Ambien. *Id.* at 405.

Plaintiff did not show for her November 7, 2011 appointment. Tr. at 402.

On December 15, 2011, Dr. Ahmed saw Plaintiff for medication follow-up and she reported that she was doing well with the medications, but the Vistaril was making her mean. Tr. at 400. Plaintiff made fair eye contact, had normal speech, fair insight and judgment, and her mood was dysphoric with congruent affect. *Id.* Dr. Ahmed diagnosed bipolar disorder not otherwise specified

-10-

and continued Plaintiff on Remeron and Seroquel, increased the Celexa dosage, continued with Ambien, added Cogentin, and discontinued Vistaril. *Id.* at 401.

In an undated form, Dr. Ahmed completed a checkbox mental residual functional capacity ("MRFC") assessment of Plaintiff. Tr. at 396. He opined that she was moderately limited in all areas of understanding and memory and in all areas of sustained concentration and persistence. *Id.* He also found that Plaintiff was moderately limited in the abilities to: accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; travel in unfamiliar places and use public transportation; and in setting realistic goals or making plans independently of others. *Id.* However, Dr. Ahmed found that Plaintiff was markedly limited in her abilities to interact appropriately with the general public, to ask simple questions or request assistance, to respond appropriately to changes in the work setting, and in being aware of normal hazards and take appropriate precautions. *Id.* He concluded that Plaintiff was unemployable and the mental impairments would last or be expected to last for a period of twelve months or more. *Id.*

On June 18, 2012, Plaintiff did not show for an appointment with Dr. Ahmed. Tr. at 427. On June 19, 2012, Plaintiff presented to Unison and saw Ms. Mason, a Licensed Social Worker. *Id.* at 428. Ms. Mason noted that Plaintiff had poor insight into her illness and needs, she was impulsive, had poor problem solving skills and made poor decisions. *Id.* She educated Plaintiff on her mental health symptoms and coping mechanisms. *Id.* Plaintiff followed up with Ms. Mason on June 22, 2012, June 28, 2012, July 25, 2012 and showed increased insight into her mental illness and was better able to effectively communicate in order to get her needs met in the community. *Id.* at 429-433.

Ms. Mason met with Plaintiff on August 7, 2012 prior to Plaintiff's appointment with Dr. Ahmed and Plaintiff was speaking loudly and excessively in anger because someone in her apartment building had bed bugs and she was not informed of the problem. Tr. at 434. She reported that she had verbally confronted the other tenant in the building. *Id.* Ms. Mason went over the importance of treatment compliance and Plaintiff reported that she felt better and was able to recall more information when she complied with treatment. *Id.* Ms. Mason met with Plaintiff on August

-11-

28, 2012 and she noted that Plaintiff was easily distracted and angered. *Id.* at 437. They reviewed coping skills. *Id.*

Ms. Mason met with Plaintiff on October 9, 2012 and she followed up with psychiatric services with assistance. Tr. at 438. Plaintiff reported that she felt "out of it" and slept most of the day and her medications made her feel drowsy. *Id.* She stated that she was stressed out as two of her children were living at her mother's house and she was helping her mother get them ready in the morning and helping the children after school with homework. *Id.* at 439. She was given encouragement and help in practicing coping skills. *Id.*

Plaintiff met with Ms. Mason on October 25, 2012 and indicated that she was frustrated that she has to take medications every day of her life in order to be around people. Tr. at 440. She was given encouragement and help in practicing coping skills. *Id.*

Plaintiff missed a December 4, 2012 medication follow up appointment. Tr. at 441.

On December 12, 2012, Plaintiff met with a nurse for medication follow up and she reported that she was complying with her medications and feeling well. Tr. at 442. The nurse indicated that Plaintiff's mood was stable, Plaintiff denied hallucinations and she was sleeping well. *Id.* The doctor called in refills of Plaintiff's medications. *Id.*

Plaintiff missed January 9, 2013 and January 16, 2013 nurse follow up appointments. Tr. at 444-445. She then cancelled a February 5, 2013 appointment with Dr. Ahmed. *Id.* at 446.

On February 13, 2013, Plaintiff followed up with a Unison nurse, who reported that Plaintiff's mood was depressed and anxious, but Plaintiff was pleasant, relaxed and made good eye contact. Tr. at 447. Plaintiff indicated that she was feeling alright, but she was paranoid about going out of the house, stating that bad things happen out there. *Id.* Plaintiff reported sleeping well and indicated that she does not see Stacy when she is taking her medication. *Id.* Dr. Ahmed called in refills of Plaintiff's medications. *Id.*

Plaintiff cancelled her March 5, 2013 and March 13, 2013 appointments at Unison. Tr. at 448-450.

**B.**     **TESTIMONIAL EVIDENCE**

Plaintiff was thirty-four years old at the time of the hearing and twenty-seven years old at her alleged onset date. Tr. at 38. At the December 6, 2013 hearing before the ALJ, Plaintiff testified that she lived with her mother and her eleven year-old daughter in her mother's house. Tr. at 38. She reported that she was released from prison in 2006 after committing a burglary when she was 19 years old. *Id*. at 39. She indicated that her mother did all of the paperwork for her to file a disability claim because her mother thought she needed to seek benefits because of her mental illness. *Id*. She explained that she was depressed and did not go out of the house anymore, she sleeps a lot and she gets frustrated with her daughter and her mother. *Id.* She stated that she does not go out of the house because she does not trust people because they are thinking about doing things to her that is not right. *Id*. at 41. She indicated that she was doing a bit better as she went to the mall with her mother. *Id*. at 42. She reported that she does not drive as she was afraid to drive after being a passenger in an accident and she could not pass the written driver's test. *Id*. at 43. Plaintiff explained that she did not finish the ninth grade because she was unruly and all of her friends were doing well in school and she had great difficulty and people made fun of her. *Id*.

Plaintiff indicated that she wanted to get her GED, but she had trouble being around people to take the classes in order to obtain the degree. Tr. at 45. She stated that she was in a group therapy program at Unison, but she stopped going because the questions asked of her were too deep and she became depressed and did not want to speak in front of other people. *Id*. at 45-46. She indicated that she stopped going to Zepf because they merely gave her medications and did not want to sit down and talk in order to help her. *Id*. at 46. At Unison, she speaks only with Dr. Ahmed. *Id*. at 49. She explained that Dr. Ahmed does not judge her when she talks about Stacy trying to make her do bad things. *Id.* She indicated that she created Stacy when she was in prison so that she would have someone to talk to, but when she left prison, she thought Stacy would stay at the prison, but she came home with her. *Id*. She described Stacy as a very jealous and evil person. Id. She explained that she does not talk to Stacy as much as she used to, but when she met with Dr. Ahmed at her last visit, Stacy was there and made her have a bad day with him because she sat next to her talking the whole time and arguing with her. *Id*. at 50-51. Plaintiff reported that the medications

-13-

help her because they are helping with her depression, slowly making the voices and visions go away, and she is starting to be able to talk to people without getting irritated.  *Id*. at 52.

When asked about her drug history, Plaintiff admitted that she last smoked marijuana two months ago when she was playing video games with her brother.  Tr. at 53.  She indicated that she took one hit and started feeling paranoid afterward and thinking everyone in the room was out to get her.  *Id.* at 53-54.  She stated that she did not go over to her brother's house often and her mother prohibited illegal drugs in the house as she is a correctional officer.  *Id*. at 54.

She explained that she had not looked for work in a while because she had trouble being around a lot of people and she had trouble reading.  Tr. at 58.  She recalled working at Hickory Farms for Christmas and a girl and her friends came over and made fun of her for being slow, so she took a basket and hit the girls with it and got fired.  *Id.*  She indicated that she lost most of her jobs because of fighting or putting her hands on someone.  *Id*.  She stated that she was trying to change this behavior as the medications were helping.  *Id*.

Plaintiff also testified that her medications make her drowsy and she takes two naps per day.  Tr. at 66-68.  She indicated that she forgets things a lot, including appointments and her medications.  *Id.* at 68.  She explained that it was not that she had a bad memory, but rather, her mind was always racing.  *Id*.  She reported that her mother reminds her to take her medications and her case manager picks her up and takes her to every appointment and calls her the day before to remind her of her appointments.  *Id.*

The VE then testified.  The ALJ asked the VE to assume a female hypothetical individual with the same age, limited education and background as Plaintiff, with no exertional limitations and a SVP of 2.  Tr. at 71.  The VE responded that Plaintiff had no past relevant work but the hypothetical individual could perform a number of other jobs existing in significant numbers in the national economy, including the representative jobs of janitor/cleaner, industrial sweeper/cleaner, food prep worker, cook helper, team assembler, motor vehicle assembler.  *Id*. at 71-72.

The ALJ presented a second hypothetical individual to the VE, asking the VE to assume the same hypothetical individual as the first hypothetical individual, but with a light work level at a SVP

-14-

of 2.  Tr. at 72.  The VE responded that such an individual could perform the jobs of production worker, laundry folder, general office clerk, housekeeping cleaner, or motel cleaner.  *Id.* at 72.

The ALJ presented a third hypothetical individual to the VE, asking the VE to assume the same hypothetical individual as the second hypothetical individual, but adding a sit/stand option. Tr. at 73.  The VE responded that the same jobs would be available for the third hypothetical individual so long as the person would stay at the workstation and the changes in position would be brief.  *Id.* at 71.

## VI.     LAW AND ANALYSIS

### A.     DRUMMOND V. COMMISSIONER OF SOCIAL SECURITY

The Court notes that the ALJ in the instant case reviewed Plaintiff's prior application for SSI and held that res judicata applied because the prior decision was administratively final and binding. Tr. at 15.  She found that res judicata applied only up to the date of Plaintiff's instant application. *Id.*  The ALJ then reviewed the medical and non-medical evidence and proceeded through the sequential analysis to determine whether Plaintiff was entitled to SSI.  In so doing, the ALJ reviewed and gave the most weight to the opinions of Drs. White and Deardorff, who issued their opinions well before the new adjudication period.  *Id.* at 26.

*Drummond v. Commissioner of Social Security* stands for the principle that absent evidence of a change in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ. 126 F.3d 837, 842 (6th Cir. 1997); *see also* Acquiescence Ruling ("AR") 98-4(6).  "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."  *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422 (1966).  In *Drummond*, the Sixth Circuit looked to whether substantial evidence was introduced to show that Plaintiff's condition changed significantly between the two hearing dates.  *Drummond*, 126 F.3d at 843.  The Court held that the Commissioner shoulders the burden of showing a change of circumstances to escape res judicata and substantial evidence was not introduced in order to find that the claimant's condition improved significantly between the two hearings so the subsequent ALJ was bound by the prior ALJ's determination.  *Id.*  The *Drummond* Court held that:

-15-

> Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ. We reject the Commissioner's contention that the Social Security Administration has unfettered discretion to reexamine issues previously determined absent new and additional evidence. To allow the Commissioner such freedom would contravene the reasoning behind 42 U.S.C. A§ 405(h) which requires finality in the decisions of social security claimants. Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.

*Id*. at 842. AR 98–4(6), issued post-*Drummond*, provides that the agency "must adopt [the residual functional capacity finding] from a final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding." AR 98-4(6). AR 98-4(6) applies *Drummond* to a claimant's RFC "or other findings required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim." AR 98-4(6). However, the "Commissioner's Acquiescence Rulings-like the Commissioner's Regulations-are not the supreme law of the land. 'It is, emphatically, the province and duty of the judicial department, to say what the law is,' *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), [']and the [Commissioner] will ignore that principle at [her] peril.' " *Harris v. Astrue,* 2010 WL 3909495, at *5 (S.D. Ohio, 2010), adopted by 2010 WL 3909493 (S.D. Ohio 2010), quoting *Hutchison v. Chater*, 99 F.3d 286, 287–88 (8th Cir.1996) (other citations omitted) (brackets in *Hutchison*).

The Court questions whether the ALJ in the instant case should have engaged in the sequential analysis for determining whether Plaintiff was entitled to SSI. AR 98-4(6) interpreted *Drummond* as requiring that an ALJ make the same finding as the prior final findings in adjudicating a subsequent disability claim with an unadjudicated period unless new and additional evidence or changed circumstances provide a basis for a different finding. AR 98-4(6). Accordingly, the ALJ in this case should have engaged only in an analysis as to whether new and additional evidence or changed circumstances provided a basis for her to deviate from the prior administrative findings. However, since neither party in the instant case raises the issue, the Court will address the issues actually raised by the parties.

-16-

### B.     TREATING PSYCHIATRIST ASSESSMENT

Plaintiff first alleges that the ALJ committed error when she failed to provide good reasons for the weight that she attributed to the opinion of Dr. Ahmed, Plaintiff's treating psychiatrist. ECF Dkt. #15 at 12-16. For the following reasons, the Court finds that the ALJ adequately articulated good reasons to attribute less than controlling weight to Dr. Ahmed's opinion and substantial evidence supports her decision to do so.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6ᵗʰ Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, she must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating

-17-

physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why she rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

Here, the ALJ addressed Dr. Ahmed's MRFC assessment and stated that she gave little weight to his assessment, reasoning that Dr. Ahmed failed to provide any explanation for his limitations and the limitations he assessed were inconsistent with the findings that he presented on the assessment form itself and they were inconsistent with his progress notes. Tr. at 25. The Court finds that while the ALJ could have provided more of an analysis of the treating physician rule and the weighing of the factors after she determined not to give controlling weight to Dr. Ahmed's opinion, her analysis met the standard and substantial evidence supports her determination.

The ALJ correctly pointed out that Dr. Ahmed provided no explanation on the MRFC assessment form for the marked limitations that he opined. Tr. at 25, 396-397. The form itself contained a Section III on the second page of the assessment to be completed by the physician and requested that the doctor insert or attach his mental status examination to it. *Id*. at 397. To the

extent that Dr. Ahmed attached his progress notes, they did not support his extreme limitations for Plaintiff. For instance, Dr. Ahmed's December 15, 2011 notes indicated that Plaintiff was somewhat stressed out financially and her Vistaril medication was making her mean and snappy, Plaintiff reported that she liked her medications, her panic attacks were in control, she was sleeping well and her mood was overall stable. *Id*. at 400. Upon examination, Dr. Ahmed noted that Plaintiff was alert and oriented, had fair eye contact, spontaneous, normal, rate and volume of speech, she had no agitation or retardation, and she had a dysphoric mood with congruent affect. *Id*. Dr. Ahmed further noted that Plaintiff denied suicidal or homicidal ideation, no signs of psychosis were observed, and Plaintiff's insight and judgment were fair. *Id.* Dr. Ahmed's September 27, 2011 progress notes indicate about the same. Dr. Ahmed observed that Plaintiff was stressed out and anxious, but she admitted that she had been off of her medications for three weeks because she missed an appointment. *Id*. at 404. She reported problems sleeping, but stated that she liked Seroquel because it kept her mood stable. *Id*. However, Dr. Ahmed noted upon examination that Plaintiff denied worsening of her agitation or depression, she denied suicidal or homicidal thoughts. Id. He also indicated that Plaintiff was alert and oriented, made fair eye contact, had spontaneous, normal, rate and volume of speech, she had no agitation or retardation, and she had a dysphoric mood with congruent affect. *Id*.

Further, as noted by the ALJ, Dr. Ahmed did not provide an explanation for his marked limitations for Plaintiff, especially in light of the relatively benign findings in the progress notes. The undersigned does not agree with the ALJ's finding that some of the areas in which Dr. Ahmed opined that Plaintiff was markedly limited were inconsistent with other areas in which he found her only moderately limited. Tr. at 25. For instance, the ALJ noted that Dr. Ahmed checked that Plaintiff was moderately limited in completing a normal workday or workweek without interruptions from her symptoms and to perform at a consistent pace without an unreasonable number and length of rest, yet found that Plaintiff was markedly restricted in her ability to respond appropriately to changes in the work setting. *Id*. The Court finds that these limitations are not mutually exclusive or inconsistent. The Court finds the same as to the ALJ's example of inconsistency between Dr. Ahmed's finding that Plaintiff was moderately limited in her ability to interact with co-workers and

to respond to criticism from supervisors, yet she was markedly limited in her ability to interact appropriately with the general public.  *Id.*  Nevertheless, the Court finds that the ALJ sufficiently articulated her reasoning for attributing less than controlling weight to Dr. Ahmed's assessment and substantial evidence supports her decision to do so due to his lack of explanation for his opinion and his lack of support from his progress notes.  The Court also finds support for the ALJ's decision of the weight to attribute to Dr. Ahmed's opinion through his notations that Plaintiff's mood was stable when she remained on her medications and Plaintiff's own admission that her symptoms were controlled when she stayed on her medications.  *Id*. at 26.

### C. ALJ'S MENTAL RFC DETERMINATION

Plaintiff also asserts that the ALJ's mental RFC for her is erroneous because the ALJ failed to include any limitation beyond a SVP of 1 or 2 and only occasional interaction with others.  ECF Dkt. #15 at 16-19. Plaintiff contends that substantial evidence supports a more severe restriction for interacting with others and a severe restriction on Plaintiff's ability to handle the pace of work and to respond to changes in the workplace.  *Id.* at 16.  The Court finds no merit to this assertion.

The ALJ in this case did find that Plaintiff had moderate difficulties in social functioning. Tr. at 19.  However, she explained that Plaintiff's ability to interact with others was limited to no more than occasional contact because the record showed that Plaintiff had a long-term girlfriend, she went shopping twice per month with her mother for an hour or longer, she talked about going on a trip to visit her girlfriend's daughter, she reported that she enjoyed spending time at a friend's home playing video games, and she was over her brother's house with his friends playing video games when she took a hit of marijuana.  *Id.* at 23-24.  Further, agency examining psychologist White found that Plaintiff was only mildly to moderately impaired in relating to others.  *Id*. at 331. The ALJ pointed out that Plaintiff also impliedly confirmed that she was able to interact with others when she expressed frustration that in order to be around people, she had to take medications.  *Id*. at 24.

Thus, while substantial evidence may exist to the contrary, the standard of review for this Court is whether the ALJ applied the proper legal standards and whether substantial evidence supports the ALJ's determination.  The ALJ's explanation for this part of her mental RFC for

Plaintiff meets both of these prongs. In determining a claimant's RFC, an ALJ considers numerous factors, including the medical evidence, non-medical evidence, and the claimant's credibility. *See* SSR 96–5p, 1996 WL 374183, at *3; SSR 96–8p, 1996 WL 374184, at *5; *Hickey–Haynes*, 116 Fed.Appx. at 726–727. The ALJ in the instant case considered all of these factors, adequately articulated them and substantial evidence supports her decision as to this part of the MRFC that she constructed for Plaintiff.

Similarly, the ALJ applied the proper legal standard and substantial evidence supports her determination that Plaintiff has no restrictions on the pace of jobs that she could perform. Tr. at 27. In finding that Plaintiff had no restrictions in this area, the ALJ stated that Plaintiff was able to successfully concentrate on television shows, computer games, and video games and she was "doing hair" on occasion. Tr. at 24, 27. She also noted that Dr. Ahmed found Plaintiff moderately limited in maintaining attention, concentration and pace for extended periods. *Id.* at 22. Moreover, Dr. White opined that Plaintiff's ability to maintain attention, concentration, persistence and pace to perform simple, repetitive tasks was only mildly to moderately impaired. *Id.* at 305. Dr. Deardorff also opined that Plaintiff's mental ability to maintain attention, concentration, persistence and pace was moderately impaired. *Id.* at 331.

However, the same cannot be found for the ALJ's failure to address Plaintiff's ability to withstand the stress and pressures of daily work activities. The ALJ acknowledged the argument of Plaintiff's counsel concerning her ability to perform the demands of such work. Tr. at 27, citing Tr. at 294. The ALJ indicated that she had considered this limitation and rejected it "for the above stated reasons." *Id.* at 27. She then concluded that "[t]he objective evidence does not show the existence severe physical impairment and the claimant's mental impairments, while limiting her ability to engage in substantial gainful work activity, do not preclude the ability to perform all work on a regular and continuing basis." *Id.* at 27. While her conclusion maybe true, substantial evidence does not support the ALJ's lack of explanation for not including a MRFC finding concerning Plaintiff's ability to withstand the stress and pressures of day-to-day work activity.

The evidence relied upon by the ALJ includes the state agency psychological consultants' mental assessments, to whom she gave "some weight," which is the most weight that she gave to

any medical assessment.  Tr. at 26.  While Defendant argues that the ALJ should not have considered these assessments because they were issued before the relevant time period in this case, the Court notes that the ALJ did in fact consider these assessments and gave them the most weight of any mental health assessment.  *Id*.  Accordingly, they are part of the review.  Dr. White opined that Plaintiff was significantly impaired in her ability to withstand the stress and pressures associated with day-to-day work activity.  *Id*. at 305.  Dr. Deardorff opined that Plaintiff was seriously impaired in her mental ability to withstand the stress and pressures associated with day-to-day work activities.  *Id*. at 332.  He even opined that such stress may increase Plaintiff's anxiety and depression, decrease her concentration and attention and slow her work performance interfere with her ability to relate to others, and possibly "lead to blatant psychotic sympotomatology."  *Id*. at 332.  And Dr. Ahmed, Plaintiff's treating psychiatrist, opined that Plaintiff was markedly limited in her ability to respond appropriately to changes in the work setting.  *Id*. at 396.  The ALJ did not address any of these mental health sources who had strict limitations for Plaintiff's MRFC as to the stress and pressure with day-to-day work activity and responses to changes in the work setting.

The ALJ did refer to her "above-stated reasons," as support for her conclusion that no restrictions were required beyond work having a SVP of 1 to 2 and only occasional contact with the public, co-workers and supervisors.  *Id*.  Those reasons included Plaintiff's ability to "successfully concentrate on television shows, computer games, and video games."  *Id*.  This is insufficient evidence upon which to find that Plaintiff's MRFC required no restrictions beyond occasional contact.  The ALJ fails to explain how watching television, playing video games or playing on a computer correlates to the ability to withstand the stress and pressure of daily work activity in a work setting.  In addition, Plaintiff reported to Dr. White that she watched television and he nevertheless found that she was significantly impaired in withstanding the stress and pressures of daily work activity.  *Id*. at 305.  She also reported to Dr. Deardorff that she watched television "all the time" and he nevertheless opined that Plaintiff's mental ability to withstand the stress and pressures associated with daily work activities were seriously impaired.  *Id*. at 332.  And while the ALJ attributed only some weight to these assessments and these assessments were in 2006 and 2007 and one of them was during a time in which Plaintiff was not on medication, these were the

assessments upon which the ALJ nevertheless gave the most weight and she failed to explain why she did not adopt these select portions of the assessments.  Moreover, the stress portions of Dr. White and Dr. Deardorff's assessments are consistent with Dr. Ahmed's assessment that Plaintiff is markedly limited in responding to changes in the work setting.

Earlier in her decision the ALJ discounted Plaintiff's credibility due to Plaintiff's alleged inconsistent statements concerning where she was living and her periods of noncompliance with medication and treatment.  Tr. at 24.  Plaintiff's credibility is a factor for her to consider in determining MRFC.  *See* SSR 96–5p, 1996 WL 374183, at *3; SSR 96–8p, 1996 WL 374184, at *5; *Hickey–Haynes*, 116 Fed.Appx. at 726–727.  However, the ALJ does not explain how this relates to a finding that Plaintiff is not limited in withstanding the stress and pressures of day-to-day work activities.  In fact, the record indicates that when situations change, Plaintiff's stress level increases.  As the ALJ pointed out, Plaintiff experienced stress in traveling to her mother's house to help her mother get two of Plaintiff's children ready for school and to help the children after school with their homework.  Tr. at 24, 439.

The ALJ also refers to "the two assigned GAF scores" of 45 and 54, and attributes some weight to the score of 54 because it was "issued at the time of the claimant's initial assessment but again was issued prior to the claimant's re-engaging in treatment."  Tr. at 26.  Yet, the ALJ attributes little weight to the more serious GAF of 45, indicating that this was assessed at a time when Plaintiff was not on medication or engaging in treatment, it was unknown who assessed the 45, and it was unknown whether it was based upon Plaintiff's symptoms or functioning.  *Id.*  However, the GAF of 45 was assessed by Dr. White, the agency examining psychologist, who also reported that Plaintiff was at that time in counseling at the Zepf Center and was on Seroquel.  Tr. at 303-304.  And the ALJ totally disregards the GAF of 41 that Dr. Deardorff assessed  based upon his opinion as to Plaintiff's ability to function.  *Id.* at 331.  Dr. Deardorff explained that he determined Plaintiff's GAF by assessing her current level of symptom severity and current level of functioniong and adopting the lower two for the final score.  *Id.* at 330.  At the time of Dr. Deardorff's assessment, he noted that Plaintiff was seeing both a psychiatrist and a counselor and was taking Seroquel and Remeron.  *Id.* at 328.  And the ALJ does not address the GAF of 50 scored by Dr. Funke on March 26, 2010

-23-

upon her evaluation of Plaintiff at Zepf after Plaintiff left Zepf and returned some years later.  *Id.* at 421.

As to the use of the GAF scores, the Court notes that GAF scores are not raw medical data "and do not necessarily indicate improved symptoms or mental functioning."  *Kennedy v. Astrue*, No. 06-6582, 247 Fed. App'x 761, 766, 2007 WL 2669153, at *5 (6th Cir. Sept. 7, 2007), unpublished.  The GAF scores allow "a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."  *Id.*, citing *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503, n. 7.  If the ALJ wishes to consider the GAF scores, she cannot pick and choose only the most beneficial to her determination without providing a more sufficient explanation for her choice and a valid comparison.

Accordingly, without further explanation and support, the Court finds that substantial evidence is lacking for the ALJ's determination that Plaintiff's MRFC did not include limitations relating to withstanding the stress and pressures of day-to-day work activities.  Accordingly, the Court remands the instant case for the ALJ to address this limited issue.

### D.    AGENCY EXAMINING PSYCHOLOGISTS' ASSESSMENTS

Plaintiff asserts that the ALJ erred in failing to discuss the evaluations and opinions of Drs. White and Deardorff in light of the fact that their assessments supported the assessment and opinion of Dr. Ahmed, the treating psychiatrist.  The Court finds no merit to this assertion.

Defendant raises res judicata in response to Plaintiff's assertion and argues that because the assessments of Drs. White and Deardorff were performed in 2006 and 2007, respectively, they predated the relevant period in the instant case as they were based upon a previous SSI application filed by Plaintiff and res judicata barred consideration of them.  ECF Dkt. #17 at 9.  The Court finds that besides the fact that Defendant's assertion is a post hoc rationalization that the Court will not consider, and while the ALJ in this case did state that res judicata applied, she nevertheless considered these assessments and proceeded onward through the sequential analysis and actually attributed more weight to the agency examining assessments than to the assessment of Dr. Ahmed, Plaintiff's own treating psychiatrist. Thus, the Court will not apply res judicata.

Contrary to Plaintiff's assertion, the ALJ did consider assessments and findings of Drs. White and Deardorff and she attributed "some weight" to them, which was more than the weight that she attributed to the assessment of Dr. Ahmed. Tr. at 26-27. The fact that their assessments supported some of the findings of Dr. Ahmed does not translate into a conclusion that the ALJ had to determine greater limitations in her MRFC for Plaintiff. The decision to afford less than controlling weight is made on the basis of whether Dr. Ahmed's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and then whether it "is not inconsistent with the other substantial evidence in [the] case record." *Blakely*, 581 F.F3d at 406. In the instant case, the ALJ properly afforded less than controlling weight to Dr. Ahmed's assessment because she found that he failed to provide any explanation for his severe limitations and his severe limitations were contrary to his own findings in his treatment notes. Tr. at 25. She then determined that Dr. Ahmed's assessment was entitled to little weight and went on to consider the other evidence, including the assessments of Drs. White and Deardorff and Plaintiff's credibility.

## VII.   CONCLUSION

For the foregoing reasons, the Court REVERSES the ALJ's decision and REMANDS the instant case for the limited issue of the ALJ's reevaluation and further explanation and analysis concerning whether Plaintiff's MRFC should have included a limitation as to production demands and her ability to withstand the stress and pressures of day-to-day work activities. Should the ALJ find that such limitations are warranted, additional proceedings should occur.

DATE: March 21, 2016

        */s/George J. Limbert*
        GEORGE J. LIMBERT
        UNITED STATES MAGISTRATE JUDGE